## Byers *v.* Vargo, Appellant.

Argued March 26, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*George Y. Meyer,* for appellant.

*Dennis C. Harrington,* with him *James P. McArdle,* for appellee.

OPINION BY MR. JUSTICE BELL, May 27, 1957:

These appeals arose out of actions in trespass for death of plaintiff's decedent resulting from a collision between a Chevrolet automobile driven by Vargo on the long Versailles-Boston Bridge in Allegheny County, and a motorcycle driven in the opposite direction by the additional defendant Moldovan. Plaintiff's decedent was a passenger on the back seat of the motorcycle. The jury returned a verdict against Vargo and in favor of plaintiff in the Wrongful Death action in the amount of $2500, and in the Survival action in the amount of $7500. The jury also returned a verdict in favor of Moldovan, the additional defendant.

Vargo filed a motion for a new trial, contending that the verdicts were clearly against the weight of the credible evidence. The Court below refused the motion and entered a judgment on each verdict. From these judgments Vargo has taken these appeals.

The accident occurred on September 22, 1952, at about 4 o'clock p.m., near the middle of the Versailles-Boston Bridge. The day was clear and dry. The ramp

on the upgrade to the bridge was 527 feet in length and the bridge itself was 780 feet in length.

There were three lanes of traffic, each lane marked by broken white lines. Vargo, accompanied by his wife, his stepdaughter and her infant child, was driving his Chevrolet car north on the bridge going from the Boston end to the Versailles end. A loaded tractor-trailer, about 40 feet in length, was proceeding at about 15 miles an hour in the right-hand (correct) lane close to its right curb, going from the Boston end toward Versailles. Vargo, traveling about 25 miles an hour and going in the same direction as the tractor-trailer, pulled into the center lane to pass. On the bridge at that time there was no traffic proceeding from the Boston end to the Versailles end except Vargo's automobile and the tractor-trailer, and there was no traffic proceeding in the other direction except Moldovan's motorcycle. Vargo's car was struck by the motorcycle to the left of its front headlight, its front wheel and axle being instantly broken. It was then struck by the tractor-trailer on the right. Both men on the motorcycle, and apparently the motorcycle itself, were catapulted into the air and continued some distance past the point of collision. Both men on the motorcycle were badly injured, plaintiff's decedent dying shortly after the accident. Whether the collision occurred in the center lane or in the left lane—the farthest from Vargo's side—and whose fault it was, were the crucial questions at the trial.

The facts, as will hereinafter more fully appear, are very unusual. Vargo sued Moldovan and recovered a verdict against him, which was affirmed by the Court en banc. Moldovan took no appeal from the judgment which was duly entered on this verdict. Moldovan testified at each trial that he never saw the tractor-trailer

or Vargo's car until the moment of impact, although there was nothing to obstruct his view.

Vargo testified that Moldovan was driving about 50 miles an hour; that after he (Vargo) pulled into the *center lane* in order to pass the tractor-trailer, he observed the motorcycle approaching in the opposite direction in its right-hand lane; that as he started to angle his car back into his right-hand lane to complete his passing of the tractor-trailer, he saw the motorcycle driver *(Moldovan) turn his head to the right* of the motorcycle and at the same instant the motorcycle swung left into the center lane about 75 feet away from Vargo and quickly crashed into Vargo's car.

Mrs. Lodor, stepdaughter of Vargo, corroborated Vargo's testimony that *he was at no time in the left lane* and that "The *motorcycle driver [Molodovan] turned his head to his right** and as he did so the cycle came into the middle lane and the collision occurred."

Vincent Benedetti, the driver of the tractor-trailer, corroborated Vargo in all his testimony and particularly that the collision occurred in the middle lane. Benedetti's seat on the tractor-trailer was so high that it enabled him to see over the top of automobiles and "he had noticed *the cycle driver turn his head and then come into the center lane* just before the collision".

James Bernick, Chief of Police, interviewed Moldovan very shortly after the accident and testified, without contradiction (by Moldovan) that Moldovan said "he grabbed for his cap *and turned his head momentarily* and the boy behind yelled, 'Look out, you are going to crash', and it was too late to do anything about it." This corroborated the testimony of all of Vargo's witnesses.

---

* Italics throughout, ours.

Plaintiff produced two witnesses—Raymond Riggs and Merle Brown. Riggs was waiting for approximately an hour at the Boston end of the bridge, intending to hitchhike to Buena Vista, even though he was standing on the wrong side of the road to secure a lift. He was approximately 900 feet away from where the collision occurred. He testified that Vargo's car swung into his wrong lane of traffic. He did not see or know that there had been any collision although thereafter he ran to the accident. He knew Moldovan and the decedent, but although he went to the hospital with them, he did not give his name as a witness or appear at the coroner's inquest; nor did he ever talk to anyone about the accident for several years thereafter. He testified that the Vargo car was in the left-hand lane when he got to the scene of the accident. His testimony was filled with contradictions, conflicts and confusion.

Merle Brown was an inmate of the Western State Penitentiary, serving two sentences for burglary. He was near the place where the accident occurred. He testified that Vargo's car was in its center lane and all at once it swerved sidewise and slid and finally struck the girder of the bridge. He thought the reason for the collision was that the Chevy must have cut too short in front of the tractor-trailer and must have been struck by the tractor. He did not testify at the coroner's inquest and although he saw the family of the decedent frequently at the hospital and at their home, he did not testify *at the trial of Vargo v. Moldovan.* His testimony, in important matters, was contradicted by every other witness.

Vargo proved by himself and his stepdaughter, and by the Chief of Police, and by the driver of the tractor-trailer, that his car was stopped in the middle lane

after the collision, and that in order to allow traffic to cross the bridge, the police moved his car from the middle lane partially into the left lane in order to allow traffic to proceed.

Vargo contends that not only was the verdict against the weight of the evidence, but that the evidence of plaintiff's witnesses was incredible. The trial Judge refused a new trial because "Rigg's testimony, although contradictory in certain respects, is not so incredible as to warrant a new trial".

When a trial Judge grants a new trial or refuses to grant a new trial because the verdict was against the weight of the evidence, the law is clearly settled that an appellate Court will not reverse unless there is a clear abuse of discretion or an error of law which necessarily controlled the grant (or refusal) of a new trial: *Clewell v. Pummer*, 388 Pa. 592, 131 A. 2d 375; *Mozino v. Canuso*, 384 Pa. 220, 120 A. 2d 300; *Edelson v. Ochroch*, 380 Pa. 426, 111 A. 2d 455; *Wilt v. Blazier*, 382 Pa. 143, 114 A. 2d 111; *Foster v. Waybright*, 367 Pa. 615, 80 A. 2d 801.

Considering (a) not only the evidence which we have hereinabove summarized, but (b) the further important fact that the jury returned a verdict in favor of Moldovan when he was clearly guilty of negligence or of contributory negligence, and (c) the further fact that a jury had found Moldovan to be guilty of negligence in this very accident in the suit of Vargo v. Moldovan—although that fact was inadmissible in the actual trial of the instant case—we are convinced that under these unusual facts and circumstances the lower Court was guilty of a manifest abuse of discretion and a new trial must be granted in the interest of justice.

Judgment reversed and new trial granted.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

What is the rule with regard to the granting of a new trial in a personal injuries case on the ground that the verdict is against the weight of the evidence? In a decision filed today in the case of *Kiser v. Schlosser*, 389 Pa. 131, the Opinion writer says: "The determination of whether a verdict is against the weight of the evidence, so that a new trial should be granted, rests *primarily within the discretion of the trial court*, and its action will not be disturbed unless there is a palpable abuse of that discretion as determined from a careful review of the entire record, or a clear error of law which controlled the outcome."[*]

In that case, the Trial Judge granted a new trial on the ground that the money verdicts returned in favor of the plaintiffs were against the weight of the evidence, and this Court affirmed the granting of a new trial. In this case the Trial Judge, with a money verdict in favor of the plaintiff, *refused* a new trial because he believed that the verdict was *not* against the weight of the evidence, and this Court *reversed,* ordering a new trial. In this state of affairs, what becomes of the rule that the question as to whether a new trial should be granted (on the subject of weight of evidence) *rests primarily within the discretion of the trial court?* In the *Kiser* case the Trial Judge said that the defendant should have another opportunity to prove the jury wrong, and this Court affirmed. In this case the Trial Judge said that the defendant should not have another opportunity to prove the jury wrong, and this Court reverses. Where is the consistency? All in one day.

Of course, it can happen and it does occasionally happen that a jury may err, it may misconceive the evidence, it may misunderstand the Judge's instruc-

---

[*] Italics throughout, mine.

tions, it may be improperly influenced by extraneous factors. When that happens, a new trial is not only in order, but imperative. But if we are to preserve inviolate trial by jury as it has come down through the centuries of juridical and lay approval, appellate courts should not upset verdicts merely because, if the individual members thereof had been sitting in the jury box they might have reached a different conclusion. The proof of error or misconduct on the part of a jury should be as obvious as a coalpile in the bright sunlight before an appellate court should brand the verdict as improper, especially when the Trial Judge who sat with the jury throughout the trial, and who saw and appraised the witnesses, solemnly declares in a written Opinion that the rendered verdict *is* in accordance with the weight of the evidence.

An appellate court undertakes a grave responsibility when, in the face of a decision by the Trial Judge that the verdict is proper and just, declares that the verdict is improper and unjust. How does the Majority in the case at bar discharge its responsibility in this respect? It says that the plaintiff's two witnesses were unreliable, emphasizing that one was a hitch-hiker and the other at the time of the trial a penitentiary convict. When an accident occurs, the witnesses are who they are. The principals of an accident do not have a previous dress rehearsal which will permit them to interrogate the potential witnesses, inquiring as to their past, their reputations, and morals, and, like the director of a play, discard those who are not impeccable in dress, speech, and deportment. A thousand chance factors interplay, intermingle, and concatenate to produce an accident, and the stationing of witnesses. At a given moment, John X is standing here and Harry Z is walking into the picture from his own little world when the catalytic agent of Fate crystallizes the forces of Nature,

the energies of engines, and the movements, foibles, and weaknesses of human beings into the phenomenon called an accident. Just as the five fateful characters in Thornton Wilder's story, the Bridge of San Luis Rey, appeared on the bridge at the kismetic moment the bridge crashed, precipitating the travelers into the gulf below, so did Raymond Riggs and Merle Brown happen upon the Versailles-Boston Bridge on September 22, 1952, at the moment when two motor vehicles quarreled in the middle of that bridge, and the violence of their wrath killed Carl D. Byers, the plaintiff's decedent in the case before us.

Reading the record in the light most favorable to the plaintiff, as we are required to do with the plaintiff as an appellee, we find that the accident happened in the following manner. On the afternoon of September 22, 1952, a young man by the name of Allan Moldovan, was driving his motorcycle at a speed of about 25 miles per hour in a southwardly direction over the Versailles-Boston Bridge in his right hand lane of the three traffic lanes on that thoroughfare, with his 19-year-old friend, Carl D. Byers, riding on the seat behind him. At this same time Steve Vargo was driving a Chevrolet automobile on the bridge in the opposite direction, that is northwardly, in his right hand lane. As Vargo's automobile approached the middle of the bridge, he moved to the center lane in order to pass a tractor-trailer which had slowly been preceding him, impeding and blocking his passage. In moving to the center lane, Vargo overshot his mark, with the result that the front end of his car invaded the lane reserved exclusively for traffic moving southwardly and which at that moment was being occupied and utilized by Moldovan on his motorcycle. Swerving over to Moldovan's lane Vargo's car struck the motorcycle with such violence that its driver and passenger were hurled into the air, falling

to the pavement with consequent serious injuries to both, Byers' fatal.

The administratrix of the estate of Carl Byers entered suit against Vargo who brought in Moldovan as an additional defendant. The jury returned verdicts in the sums of $2500 in the Wrongful Death Action and $7500 in the Survival Action in favor of the plaintiff against Vargo. Moldovan was exonerated of all blame. Vargo moved for a new trial, contending that the verdict was against the weight of the evidence. This motion was refused by the lower Court and Vargo appealed here.

The Majority of this Court now reverses the decision of the Trial Court, asserting that he abused his discretion in refusing to grant a new trial. I dissent and assert, on the contrary, that the Trial Court would most clearly have abused his discretion if he *had* granted a new trial. We have here nothing more nor less than a question of fact for adjudication. Vargo insists that Moldovan left the southbound traffic lane and crossed over to the center lane to strike his automobile, while Moldovan insists just as strongly that Vargo crossed over from the center lane to invade his (Moldovan's) lane and smash his motorcycle. The stories told by Vargo and Moldovan are absolutely irreconcilable. From the day the accident occurred, Vargo and Moldovan have been arguing their respective positions, and from now until doomsday each will be proclaiming that he was right and the other wrong. But mundane questions of this kind do not, and cannot, wait until Judgment Day for decision. Twelve good citizens, holding aloft the lantern of dispassionate inquiry, have studied the locale of the mishap, listened to the stories of the participants, analyzed the conflicting theories, and, without favor, bias, or prejudice have concluded that Moldovan was innocent of fault and Vargo laden with blame for the untoward happening.

Why is their conclusion challenged? There is nothing to suggest that the lantern, burning brightly at all times with the oil of wise instruction supplied by the Trial Judge, failed to illuminate the issue. There is not the slightest intimation that the jury stumbled over the evidence. No one mutters behind a concealing hand that the jury substituted whim or caprice for honest and conscientious deliberation. On what basis, then, can it be argued that the Trial Judge was remiss in his duty in allowing the verdict to remain as rendered? On what ground can the Majority stand in declaring that the Judge abused his discretion because he refused to condemn the verdict and refused to order the new trial which is so unnecessary, so superfluous, and, to the winning plaintiff, so unjust?

The Majority advances, as one reason, for reversing the verdict the assertion that Moldovan "was clearly guilty of negligence or of contributory negligence." The jury did not say so, and they are the ones who saw the witnesses and heard the evidence. The Trial Judge did not say so, and he saw the witnesses and heard the evidence. An appellate court may pronounce contributory negligence only when *all* the credible evidence in the case points irrefutably in that direction. There is no such unanimity of accusing forefingers in this case. Moreover, there can be no contributory negligence chargeable to Moldovan. Moldovan is not a plaintiff.

The defendant Vargo's negligence was abundantly proved by two disinterested witnesses, Raymond Riggs and Merle Brown, whose credibility the Majority attacks on all fronts. The Majority says that Raymond Riggs was waiting "at the Boston end of the bridge, intending to hitchhike to Buena Vista, even though he was standing on the wrong side of the road to secure a lift." I find it necessary at the outset to dispel any idea that, because Riggs was "intending to hitchhike

to Buena Vista," he must have been a wanderer thumbing rides across the continent. The Buena Vista to which he was destined is not the Buena Vista in Mexico, but a tiny hamlet of 600 souls in Allegheny County, only 4 miles away from the bridge and where Riggs lived with his wife and seven children. Riggs was a workman, not a drifter. He had just finished his day's toil shovelling coal, and his employer, Alvin Mellon, who lived in Versailles, had taken him in his car, as far as he could transport him, to the Boston end of the bridge, from which point Riggs intended to get home either by bus or a free ride.* The Majority insinuates that there was something incredible about Riggs waiting "on the wrong side of the road," and that his statement in this respect proves some dark motive, not quite explained by the Majority. The fact of the matter is that, for his own purposes, Riggs was not on the wrong side of the road. He stood at that point, which was close to a newsstand at which many motorists stopped for their newspapers, so that he could have an opportunity to look the motorists over and discover those who would be driving to Buena Vista and take him home. He testified: "Well, most of them stop there for the paper at the drug store and, like I said, I knowed most of them from Buena Vista, and I could see who was driving the automobile when it come toward me. If I knowed them I would flag them down." He had another reason for standing where he did. It was a bus stop. He testified: "That is true, but if I stood where I was standing I could always catch a bus if I didn't catch a ride. That is a bus stop there."

---

* Versailles with a population of 2484 and Boston with a thriving 2000 are towns in Allegheny County, whose godfathers, like those of Buena Vista, were evidently also enthusiastic readers of the atlas and history.

The Majority Opinion says that Riggs' testimony was "filled with contradictions, conflicts and confusion," and in support of that sweeping denunciation offers purported illustrations. We have seen that the animadversion about waiting on the "wrong side of the road" lacked substance. The next supposed barb that he was "approximately 900 feet away from where the collision occurred," and therefore could not have seen much, similarly lacks persuasiveness because 900 feet is not such a distance that one cannot see the movement of three motor vehicles on an open bridge with no obstacles intervening. It is to be noted further in this connection that Riggs never said he was 900 feet away. This was purely a calculation on the part of the defendant's attorney.

The third illustration submitted by the Majority, in intended destruction of Riggs' testimony, would suggest to me that the Majority is reading a different record from the one in my possession. The Majority says that Riggs said "he did not see or know that there had been any collision." The printed record submitted to me shows that Riggs testified: "Q. Now, can you tell us, if you will, Mr. Riggs, just what action this Chevrolet took as it was passing the truck? A. *Well, as I seen it,* when the Chevrolet got to the front end of the truck it swerved over—he made a left-hand swerve over into the right-hand lane of the motorcycle. Q. I see. And what happened? A. *And it caught the motorcycle in the center of the motorcycle.* Q. And what happened to the motorcycle then? A. The motorcycle spun around and slid down the road and I seen the two bodies fly up in the air." If that is not seeing a collision, then language has lost all power of conveying meaning. Riggs testified further: "Q. Now, Mr. Riggs, you say that as the Chevrolet was passing the truck he seemed to swerve to his left; is that correct?

A. Yes, sir. Q. And what happened? A. *Well, when he swerved over to his left-hand side he caught this motorcycle.* Q. What happened to the motorcycle? A. The motorcycle went a little piece, fell, and caught fire."

The Majority says that Riggs "knew Moldovan and the decedent, but although he went to the hospital with them, he did not give his name as a witness or appear at the coroner's inquest." The inference here is that Riggs' testimony was influenced because of a prior friendship with Moldovan and Byers. The record flatly contradicts the Majority's assertion and the inferences drawn therefrom. Immediately after the collision Riggs ran to the scene to render assistance to the injured motorcycle riders lying on the pavement. He was asked and replied as follows: "Q. How many were there? A. There was two. Q. *Did you know either of them?* A. *No, sir.* Q. *You did not?* A. *No, sir.*" Also: "Q. Mr. Riggs, immediately after the accident what did you do; that is, you ran up to the point where the accident occurred and what did you do? A. I stopped at the first boy. Q. Who was that? A. That was the Byers boy, *I found out later.*" Further: "Q. And did you know who that boy was that time? A. No, sir, *I did not.*" Again: "Q. Now, at that time, Mr. Riggs, what did you do after that? A. I ran back to where *I later found out it was the Byers boy.*"

The Majority attempts to make of Riggs a rogue. The record would show him to be a modest person who minded his own business but did not fail to respond when mercy called for volunteers. When he got to the locale of the accident he endeavored to give every help the situation called for and assisted several firemen in placing the Byers boy on a stretcher. He even accompanied the stricken lad to the hospital and then, his Samaritan duties ended, he faded out of the picture.

He gave his name to no one because no one sought it. When, a year or so later, he was asked to appear as a witness, he agreed to do so. If the Majority and I are reading the same record, I see no reason for its condemning Riggs' testimony as being "filled with contradictions, conflicts and confusion." I have read every word of his testimony, which covers 51 printed pages, and I found it to be singularly free of any significant contradictions, and, like the jury, I concluded that it was straightforward, clear, and believable.

Merle Brown, the other witness for the plaintiff, has also come before the intense fire of the Majority's attack on the verdict, but, I believe it will be shown that the fire has failed to hit anything vulnerable. Merle Brown, who lived in a two-story frame building in Versailles within easy sight of the bridge itself, happened to be walking across the bridge on the afternoon of the accident. As he reached the middle of the span the drama of the accident unfolded. He was only 35 to 40 feet away from the focal point of the tragic episode. He testified to how he saw the motorcycle moving along in its right lane of traffic, how he observed the Vargo automobile leaving its right lane and crossing over to the center lane, and then how it swerved over to the lane occupied by the motorcycle: "Q. Now, after it [the Vargo car] swerved to its left what happened? A. It came across, come back out across the center lane and over into the right hand lane of the bridge, the right hand lane going south, that is, and this motorcycle was going in that right hand lane going south, and it come right into the path of the motorcycle—the automobile did. Q. Was there a collision? A. Yes, there was. Q. What part of the automobile collided with what part of the motorcycle? A. The left front end of the automobile collided with the motorcycle at about just in front of the back wheel of the motorcycle."

380

The Majority says that Brown's testimony "in important matters was contradicted by every other witness." This hardly represents the realities of the matter, because in many important particulars Brown was corroborated by Riggs and by Moldovan, and even by the Chief of Police testifying for the defendant. At any rate, if he was contradicted, the contradiction was a matter for the jury to consider.

Merle Brown, who was 23 years of age at the time he was summoned as a witness, got into trouble with the law following the accident and, at the trial, appeared in the garb of an inmate of the Western Penitentiary in which he had been incarcerated for 18 months. The Majority assumes that this incarceration destroyed or considerably damaged his credibility as a witness. This does not follow at all. Although 18 months in prison are like 18 lashes of ignominy over the back of honor and reputation, they do not tear out the tongue of truth. Manacled to shame and led into Court between jail guards, a prisoner may still relate what his eyes have seen with as much fidelity and accuracy as one who has not blundered from the paths of rectitude. Where there is no motive to lie, and none has been shown here, a convict, in full possession of his faculties, can be as trustworthy as a paragon of virtue. Memory is but a mechanical function which, uninfluenced by passion, bias, or prejudice, operates as untrammeledly and faithfully as sight, hearing, taste, touch and smell. It has not been suggested anywhere that Brown was influenced by the plaintiff to tell anything other than what he knew; it is not said that he was seeking personal gain in answering the questions put to him in Court. Why then does this Court regard him as untruthful? The jury which, after all, is the tribunal which passes upon credibility, knew full well that Brown was a convict. The very first question put to him, after he had

given his name and age was: "Mr. Brown, I believe you are presently an inmate at the Western State Penitentiary; is that correct?" And he replied: "Yes, sir," with the specific data that he had been in prison for 18 months because he had committed two burglaries. Defendant's counsel, it can well be imagined, did not allow the opportunity to pass to remind the jury in his summation that Brown was a convict, but the jury still believed Brown was telling the truth. What justification then is there for any assumption that because Brown got into trouble on a matter entirely unrelated to the present litigation, the inherent desire for truth left him, and that the prison sentence branded him as a scion of Ananias?

The Majority gives a third reason for ordering a new trial, namely, that in another lawsuit arising out of this same accident Vargo sued Moldovan and recovered. What happened in that case is entirely irrelevant to this one. When Moldovan was asked at the trial of this case why he did not sue Vargo since he had suffered a broken leg and knee as a result of the accident, he replied: "I am just happy to be alive. That is all I can say." This may be a partial explanation for the result of the other trial. But whatever may have been the cause for that verdict, it is unjust to penalize the present plaintiff in this case for what happened in another case. If it is argued that one of the two verdicts must be in error, why must it be assumed that this is the erroneous one, especially since this trial is absolutely free of error? The case was well tried by able lawyers on either side; it was presided over by Judge Samuel A. Weiss, an experienced, extremely able, and conscientious trial judge; the charge was free of fault; there were no blemishes in the introduction or exclusion of evidence. The jury was intelligent, attentive, and deliberative. Why must all the parties, all

the witnesses, all the lawyers, and another jury make their way over the bridge of a new trial? So far as the decision of the Court in this particular case is concerned, another trial, so demonstratedly unnecessary, is another fall of the Bridge of San Luis Rey, with a sixth traveler among the falling victims—justice itself.