Lupi, Appellant, v. Keenan.

Argued April 30, 1959.   Before MUSMANNO, JONES, COHEN and BOK, JJ.

*Max W. Gibbs,* for appellant.

*Paul C. VanDyke* and *Robert W. Beatty,* with them *Ernest L. Green, Jr.,* and *Cochrane and VanDyke,* and *Butler, Beatty, Greer & Johnson,* for appellees.

OPINION BY MR. JUSTICE BOK, May 28, 1959:

Plaintiff has a jury's verdict for personal injuries in the sum of $28,028.21. The propriety of granting a new trial by the court below is the question before us.

Plaintiff visited several other taprooms and drank there before he finally entered defendants' establishment. During the twenty minutes he was there he ordered more drink and had change for twenty dollars lying on the bar. For some reason not now important, Keenan, Jr. ejected him, threw him to the sidewalk, and beat him. Someone pulled the younger defendant away after the older defendant had tried to prevent anyone from interfering. Plaintiff got to his feet and wanted to return to the bar to get his money. He then described his injury as follows: "We started scuffling again. I couldn't take any more. I was wrestled, backing up to protect myself, felt a crash, and hurt myself. . . . I crashed into the window. . . . I didn't swing at the window. . . . Q. What cut your arm? A. The glass."

This is plaintiff's full description of how he was hurt.

He suffered a serious cut at the inner fold of the elbow and no other cuts on the arm or hand.

Defendants' bartender, called as a witness by the plaintiff, testified that Keenan, Jr. ejected the plaintiff and then returned and locked the door. He added: "I believe he [Keenan] was inside when I heard the crash and I thought someone had thrown a bottle through it [the window] or something."

The defense, given by both defendants and by at least seven other witnesses, was that plaintiff, either in a fury or while trying to strike a third person, put his fist through the window from the street while the defendants were inside.

The court below outlined this evidence and justified the new trial on the ground that "plaintiff failed to 'describe, picture, or visualize what actually happened' and because the jury's verdict is clearly against the weight of the evidence. We go so far as to say that 'the jury's verdict was so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative, so that right may be given another opportunity to prevail': Jones v. Williams, 358 Pa. 559 (1944)."

In view of this statement, of the obvious weight and shape of the defendants' evidence, of the obscure and meagre account given by the plaintiff, and of the contradicting evidence of plaintiff's own witness, the bartender, that Keenan, Jr. was inside when the window was broken, plaintiff has not sustained the heavy burden he must carry to upset the grant of a new trial. We will not reverse unless there is a clear abuse of discretion or an error of law which necessarily controlled the result and was so certified by the court below: *Mozino v. Canuso*, 384 Pa. 220, 120 A. 2d 300 (1956); *Hartigan v. Clark*, 389 Pa. 283, 133 A. 2d 181 (1957); *Byers v. Vargo*, 389 Pa. 365, 133 A. 2d 163 (1957).

The courts do not sit as boards of assessors to tally up damages for all who are injured. Where a verdict is so greatly against the weight of the evidence as to be a shock to the judicial conscience a court has not only the right but the duty to disagree with the jury and to overturn its verdict, no matter how many trials need be had in the interest of justice: *Elia v. Olszewski*, 368 Pa. 578, 84 A. 2d 188 (1951); *Kiser v. Schlosser*,

389 Pa. 131, 132 A. 2d 344 (1957) ; *Clewell v. Pummer*, 388 Pa. 592, 131 A. 2d 375 (1957). And if the court that saw and heard the case gives orderly reasons for granting a new trial that have foundation in the evidence, as is the case here, we should stand behind it.

In *Coward v. Ruckert*, 381 Pa. 388, 113 A. 2d 287 (1955), Mr. Justice MUSMANNO spoke with approval of this excerpt from the opinion in *Frank v. Losier & Co.*, 361 Pa. 272, 64 A. 2d 829 (1949) : "The granting of a new trial is an inherent power and immemorial right of the trial court, and an appellate court will not find fault with the exercise of such authority in the absence of a clear abuse of discretion. . . . One of the least assailable grounds for the exercise of such power is the trial court's conclusion that the verdict was against the weight of the evidence and that the interests of justice therefore require that a new trial be awarded: especially in such a case is an appellate court reluctant to interfere."

The order is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the evening of August 6, 1955, Serafino Lupi, 26 years of age, entered the Keenan's Musical Bar in the City of Chester, a liquor establishment owned by Joseph Keenan, Sr., and operated by his son, Joseph Keenan, Jr. (herein to be referred to as Joe Keenan). Lupi purchased several drinks, (one for Joe Keenan); and placed a twenty dollar bill on the bar. He then went to the lavatory. On his return to the barroom, Joe Keenan, who had in the meanwhile absorbed the drink which Lupi had purchased from the Keenans for a Keenan, struck Lupi on the head. He then threw his arm around Lupi's neck, dragged him outside and

hurled him to the pavement. Here he jumped on him, pinned his arms to his side, and rained blows in his face. Keenan, Sr., followed his son outside to the pavement and when he saw that someone was making an effort to pull Joe off Lupi, he ordered him away. "Don't interfere with my son," he commanded. And the beating continued.

Lupi finally managed to struggle to his feet and started back into the tavern to get the change from his twenty-dollar bill, but Joe Keenan blocked his re-entry. The men scuffled and wrestled, but Lupi knew he was getting the worst of it, and he tried to get away. Testifying later he said: "A. I was wrestling with Joe; I was trying to get away from Joe. I had enough. I knew I couldn't take any more. Q. Had enough of what? A. Of the beating. I just wanted to get my money and go home."

In the continuing struggle, while Lupi was backing up to get out of his assailant's clutches, he crashed into the window of the tavern, sustaining severe and crippling injuries to his right arm.

In the ensuing lawsuit, which Lupi brought against both Keenans, the jury returned a verdict of $28,028.21. The trial judge ordered a new trial, and this Court has affirmed the order.

I believe the new trial to be entirely unnecessary. A factual controversy has been fairly tried and fairly concluded. The evidence sustains the verdict. The Majority Opinion of this Court quotes the trial judge as saying that the "plaintiff failed to 'describe, picture, or visualize what actually happened.'" This is a strange statement coming from the trial judge who, in charging the jury, had no trouble in describing, picturing, and visualizing what happened. In his charge the trial judge said: "The plaintiff further says that he got to his feet, that he wanted to go home and that he

said to Keenan 'Give me my money, give me my change', which he says he had left on the bar after having given the bartender a twenty-dollar bill to pay for certain drinks he had bought, and which he had not picked up and put in his pocket; he says that Keenan, Jr., refused to give him the money, that he did not have any money coming to him; the plaintiff says that he attempted to go back into the barroom to get it and that Keenan, Jr., prevented him and that, in the struggle he was, to use his words as I recall them, he backed into the window in such a way that his arm was cut."

Here we have a clear picture of a customer asking for money which belongs to him, we have a clear picture of the manager of the establishment preventing him from collecting that money, and we have a clear picture of a physical struggle in which the customer, in protecting himself, is physically injured. Later on, the trial judge said to the jury: "So that we come to a very simple question here: How did this man's arm get hurt; if it was hurt the way he said it was hurt, he has a right to recover but if he was hurt as the defense says he was hurt, no matter how pitiful a thing this is,—he has no right to recover."

What other question would there be to submit to a jury?

The Majority Opinion also quotes the trial judge as saying that the jury's verdict was clearly against the weight of the evidence. In *Carroll v. City of Pittsburgh*, 368 Pa. 436, a case, incidentally where the present Opinion-writer was the Trial Judge who had ordered the new trial, this Court reversed the order for a new trial and said: "A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. Neither should it ordinarily be granted on the ground that the verdict was against

the weight of the evidence where the evidence is conflicting and the jury might have found for either party."

If it was improper to award a new trial in the Carroll case, why is it proper to order it here? Where is the difference? The evidence in this case was certainly conflicting. Lupi said his arm was crippled because Joe Keenan violently threw him out of the taproom, beat him, punched him, and then, as he was trying to defend himself, pushed him into a glass window. The defendants' story is that Lupi was evicted from the taproom, that the door was closed on him, and that somehow he drove his fist through the window. Do not these conflicting contentions present a jury question?

The Majority Opinion says: "The defense, given by both defendants and by at least seven other witnesses, was that plaintiff, either in a fury or while trying to strike a third person, put his fist through the window from the street while the defendants were inside."

This blanket statement by the Majority is not woven from the evidence given at the trial. There is not one thread of testimony from which to suspend the assertions that the plaintiff put his fist through the window "in a fury." And if his arm went through the window while defending himself against an aggressor he is certainly entitled to recover from that aggressor.

The Majority Opinion speaks of "at least seven other witnesses" supporting the defendants' version of the violent episode. The Majority, I suppose, refers to the bartender as one of these seven witnesses, but it will be noted that the bartender's testimony, as quoted in the very Majority Opinion, is very vague and inconclusive. The bartender testified: "I believe he [Keenan] was inside when I heard the crash and I thought someone had thrown a bottle through it [the window] or something."

The Majority is so satisfied with this statement that it repeats part of it later on in the Opinion. But let us see how close it comes to satisfying the desire for accuracy and truth. The bartender said "I believe" that is, he *guesses* that Keenan was inside the barroom. Then he said "I thought someone had thrown a bottle through it" [the window]. No one in the whole trial suggested that Lupi threw a bottle. And then, on the summit of this objective reliability, which seems so very much to have impressed the Majority, the bartender added the shining capstone of convincement— "Or something."

Another one of the seven witnesses who apparently created such a favorable impression on the Majority for their accurate reporting of what occurred, was Oscar Pinder who testified: "Q. You say that you were inside when this window crash occurred? A. Yes, sir. Q. *You do not know who crashed it, you did not see?* * A. *No,* on account of those drapes were up there."

Still another one of the seven (Mrs. Fanny Alexander), who contributed to the satisfaction of the Majority that justice demanded a new trial, testified: "Q. Where was the crash? A. *So I didn't know what happened.* There was a crash and I looked up and I saw Mr. Keenan, Joe, Jr., and about a few minutes after that someone came running in and he said there was a boy out there bleeding to death, so I ran out and this young boy here. . ."

And then another of the redoubtable seven was Mrs. Lydia Moore who testified: "Q. Did you see what caused the window to crash? A. *No, I didn't see that.*"

Even Keenan, Sr., did not actually see what happened because he was turned away from the window

---

* Italics mine throughout.

at the time of the crash. The testimony of the three persons who said that they saw the plaintiff put his fist through the window was exceedingly suspect, and the jury could well have been justified in disbelieving it. One of these witnesses, Jacob Hartzell, could have been biased in favor of the defendants since he was a tenant of the defendants at the time of the trial. Nor was the testimony of Richard Taylor easy to believe. He said that when he was some 30 feet away from Keenan's tavern (this was at night) he saw Lupi standing alone and that suddenly Lupi put his fist through the window. Hartzell said that no one else was around. The evidence is overwhelming that other people were present. Taylor had been a friend of the Keenans' for 25 years and quite obligingly fixed up the window after it was broken.

And then, of the formidable Atlases who hold up the Majority's decision that the defendants are entitled to another chance to win the case they fairly lost, we must not overlook Robert E. Stam, who narrated a tale wholly different from that advanced by the defendants themselves. Stam said that he saw Lupi put his fist through the window while he was fighting with a man whom he called "Shadow." The jury could easily believe that this witness was dealing with shadows throughout his entire testimony.

The jury heard all these seven witnesses and concluded that their story was not trustworthy. On the other hand, they could well believe that the savage and brutal attack by the 210-pound Joe Keenan on the slight, 26-year old plaintiff, and his continuing barbarous treatment in trying to prevent Lupi from collecting his own money was the act of a man fully capable of beating his young victim to the point where he would fall or be pushed through a window. The jury could further reject as unacceptable the theory that Lupi, a

young man in possession of his faculties, would suicidally thrust his arm into mangling plate glass. Who could deny the truth of Lupi's sobbing outburst when his arm was cut: "I don't want to die, I am too young to die."?

The Majority seeks to justify its decision of ordering a new trial by stating that in the case of *Coward v. Ruckert,* 381 Pa. 388, I quoted from the Opinion in the case of *Frank v. Losier,* 361 Pa. 272, where this Court said that "The granting of a new trial is an inherent power and immemorial right of the trial court, etc." It is a fact that I did quote from *Frank v. Losier* in justifying the granting of a new trial in the case of *Coward v. Ruckert,* but the facts in the *Coward v. Ruckert* case were as different from the facts in the present case as a church is from a whiskey tavern. In the *Coward v. Ruckert* case the defendant was charged with having negligently driven his automobile into a pedestrian and killing him. The jury returned a verdict for the defendant. The trial judge in ordering a new trial pointed out that the defendant was clearly guilty of having run down the pedestrian since he had entered "a plea of guilty in the Court of Quarter Sessions to a charge of hit and run growing out of the same accident." The evidence showed that the decedent, a 71-year old man, was walking along the berm of a country road when he was run down by the defendant who struck him with such violence that the body was hurled 40 feet. The verdict of the jury in that case was so utterly contradictory to the evidence and so entirely unsupportable that the trial judge almost fell out of his chair with astonishment when it was announced. The trial judge graphically described his reaction as follows: "When the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the

16

bench, then it is truly 'shocking to judicial conscience' . . . That is the effect the jury's verdict had on the trial judge in the present case, and we can truly say it was the first such shock so experienced in almost ten years of trial experience on the bench."

There is nothing in the record of the case at hand which indicates whether the trial judge here almost fell from the bench when the jury returned its verdict for the plaintiff. However, there can be no doubt in my mind that the figure of Justice totters on her pedestal as she sees the action of this Court requiring the plaintiff Lupi, all so unnecessarily, to undergo the ordeal of another trial, of once more being hit on the head, again being thrown into the street, again being beaten, again being denied his own money, again being pushed violently into mutilating glass, again watching the blood spurt from an arm now rendered useless for life, and again wondering and worrying whether the Court will allow him to keep the verdict which a jury may award him. The figure of Justice may well be shocked that a new trial should be ordered on the supposed authority of a past decision where the facts were as different from the ones in the present case as a church is from a beer saloon where twenty-dollar bills are accepted but never changed.