642 A.2d 509

**Ronald PECK, Appellant,**

**v.**

**Mark Frederick HABERLE.**

Superior Court of Pennsylvania.

Argued April 6, 1994.

Filed May 24, 1994.

Petition for Allowance of Appeal Denied Oct. 13, 1994.

David M. Kozloff, Wyomissing, for appellant.

Jeffrey L. Schmehl, County Sol., Reading, for appellee.

Before CIRILLO, JOHNSON and CERCONE, JJ.

CIRILLO, Judge.

This is an appeal from a judgment entered in the Court of Common Pleas of Berks County. We affirm.

Appellant Ronald Peck was awarded a jury verdict in the amount of $6,530.00. The jury had determined that appellee Mark Frederick Haberle was 100% liable for an automobile accident involving his vehicle and Peck's vehicle. Peck was stopped in the eastbound lane at the intersection of Route 422 and Hill Road in Berks County. Haberle was travelling eastbound and, upon observing Peck's stopped vehicle, Haberle applied his brakes, skidded for approximately 75 feet, struck the rear of Peck's vehicle, and propelled Peck's vehicle approximately 100 feet. Peck was thrown about the interior of the car.

The jury awarded Peck damages as follows: $750.00 for medical expenses; $5,280 for lost earnings; and $500.00 for remaining damages. The trial judge, the Honorable Frederick Edenharter, molded the verdict to $780.00 to reflect the receipt of applicable first party automobile insurance benefits ($750.00 in medical benefits and $5,000.00 in lost wages).

Peck filed post-trial motions, seeking additur or, in the alternative, a new trial. Peck contended that the award of $500.00 for general damages, including pain and suffering, humiliation, and loss of life's pleasures, was inadequate. This motion was denied. Thereafter, the verdict was reduced to judgment and this appeal followed. See Pa.R.A.P. 301. Peck raises one issue for our review:

When the jury concluded that plaintiff/appellant Ronald Peck was injured, disabled, and sustained general damages

for a period of thirteen (13) weeks, was an award of five hundred dollars ($500.00) for general damages so inadequate as to require the grant of a new trial?

Following the car accident, Peck was taken to Pottstown Memorial Medical Center suffering from lower back and neck pain. Two days later, Peck sought treatment from his family physician, complaining of pain in his neck, lower back, and left leg. Peck's family physician referred him to Dr. Gregory Lignelli, a neurosurgeon.

Peck had first seen Dr. Lignelli several times over the fourteen years preceding the car accident. In 1974, Peck sought relief from Dr. Lignelli following a work-related accident in which Peck had strained his back lifting castings at Doehler–Jarvis Company. Peck saw Dr. Lignelli again in 1977, after another work-related back injury. Peck suffered from a herniated disc and Dr. Lignelli performed surgery. Ten years later, in July of 1987, Peck suffered pain in his right leg and lower back as a result of tripping on a piece of broken flooring while working at Doehler–Jarvis Company. Peck developed severe pain and once again saw Dr. Lignelli. Dr. Lignelli performed a myelogram which indicated a ruptured disc and also performed a second surgery. Peck returned to work in December of 1987. The car accident occurred two months later, on February 13, 1988.

Peck saw Dr. Lignelli two days after the accident. A physical examination revealed a full range of motion and, as Dr. Lignelli testified on cross-examination, x-rays taken at the hospital after the accident were "essentially normal." Dr. Lignelli prescribed Darvocet for several weeks. Thereafter, Peck saw Dr. Lignelli approximately once a month for the next three months. Dr. Lignelli discharged Peck from his care in late April or early May of 1988.

Approximately three years later, on March 22, 1991, Dr. Lignelli performed a third surgery on Peck, a laminectomy. Peck was also treated for depression.

At trial, Dr. Lignelli testified that Peck had an underlying degenerative disc disease in his lumbar spine which had

necessitated the two prior operations. Dr. Lignelli testified that the stress and strain of the automobile accident aggravated Peck's previous injuries. Additionally, Dr. Lignelli testified that Peck would have a permanent foot drop, necessitating that he wear a foot brace, and that he would be unable to return to the work he was doing prior to the accident, but might be able to do some kind of sedentary work eventually.

Peck was also examined by defendant Haberle's expert, Dr. Ellis F. Friedman, an orthopedic surgeon. Dr. Friedman opined, to a reasonable degree of medical certainty, that the symptoms which led to the 1991 surgery could not have been caused by the automobile accident. Dr. Friedman stated:

[T]hese symptoms that led to the 1991 surgery did not come on until three full years after the accident when he had the sudden onset of severe pain and weakness with foot drop. It is physically and physiologically and anatomically impossible for an event to occur at one time and three years later the disc then shrivels, breaks off, and ruptures and lies free in the spinal canal, which is the condition that Dr. Lignelli (the neurosurgeon who had been treating Peck since two days after the accident) found when he did surgery shortly after those symptoms came on. Those pieces of disc broke off and were lying free in the spinal canal at the time of the March, 1991 surgery because of something the patient did in February, 1991. It could have been something as simple as bending over a sink or bending down to pick something up or sneezing or coughing or straining to have a bowel movement. Anything of that type can cause a piece of disc to literally blow out and lie free in the spinal canal. It is impossible for a piece of disc to blow out and lie free in the spinal canal for three years and not cause any symptoms. These symptoms, as the patient so carefully told me came on (snap of fingers) that quickly.... Three years after the accident some event occurred which did make pieces of the disc break off, and that's what led to the patient's immediate onset of pain.

It is axiomatic that the amount of a damage award is an issue for the jury which should rarely be altered on appeal.

*Hawley v. Donahoo,* 416 Pa.Super. 469, 471, 611 A.2d 311, 312 (1992).

> [A] trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence[;] an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge.

*Read v. Shu,* 419 Pa.Super. 227, 230, 615 A.2d 109, 110 (1992). Our review, then, is limited to a determination of whether the trial court committed a palpable abuse of discretion. *Id.* This court must examine the record and assess the weight of the evidence in order to reach this determination. *Id.*

In *Elza v. Chovan,* 396 Pa. 112, 152 A.2d 238 (1959), our Supreme Court stated:

> It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by witnesses. If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgment for the jury's. The mere fact that the verdict is low does not mean that it is inadequate.

*Id.* at 115, 152 A.2d at 240. In other words, a reversal based on the inadequacy of the verdict is appropriate only where "the injustice of the verdict stands forth like a beacon," *id.* at 118, 152 A.2d at 241, or, as Justice Musmanno eloquently stated, when "the figure of Justice totters on her pedestal." *Lupi v. Keenan,* 396 Pa. 6, 16, 151 A.2d 447, 453 (1959) (Musmanno, J., dissenting).

> When the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

*Id.* at 15–16, 151 A.2d at 452.

The jury's authority in this area, however, is not absolute. It may not "in law, ignore what is patent to the eye, obvious to the mind, and clear to the normal process of

138

ordinary computation." *Thompson v. Ianuzzi*, 403 Pa. 329, 169 A.2d 777 (1961). In *Boggavarapu v. Ponist*, 518 Pa. 162, 542 A.2d 516 (1988), the Pennsylvania Supreme Court stated that "(p)ersons may indeed suffer pain that they attribute to a cause, but at law the cause they assert must be accepted as the cause of their pain." *Id.* at 168, 542 A.2d at 519.

Utilizing these standards, our review of the record does not reveal a palpable abuse of discretion. *Read, supra.* The verdict of $500.00 for non-economic damages, although low, is not so glaringly inadequate as to shock the conscience of the court. *Bortner v. Gladfeltner*, 302 Pa.Super. 492, 448 A.2d 1386 (1982). The evidence reveals no disagreement that the accident aggravated Peck's back condition. The experts did disagree, however, as to what created the necessity for the third back surgery. This point of disagreement was crucial to Peck's damage recovery. The jury, in its province, could reasonably conclude that the car accident caused Peck additional pain, but that the car accident was not necessarily the legal cause or impetus for a third surgery occurring almost three years after the accident and Peck's resultant back, neck, and leg pain. The jury could have properly determined from this evidence that the lapse of approximately three years between the accident and the operation severed the chain of causation. In this respect, the jury could properly find that Peck's pain and suffering caused from the car accident was limited to the thirteen weeks following the accident; its award, consequently, reflects that limited time period. We find no palpable abuse of discretion. *Read, supra.*

Judgment affirmed.