John P. DAVIS & Kathleen A. Davis, Indiv. & as Co–Admin. of Est. of Erin Lynn Davis, Dec'd

v.

Ronald R. STEIGERWALT, Appellant, and Denise Prutzman & Edward Metroka, Indiv. & as Co–Admin. of Est. of Holly A. Metroka, Dec'd.

Superior Court of Pennsylvania.

Argued Feb. 11, 2003.

Filed March 4, 2003.

Reargument Denied May 14, 2003.

Suzanne T. Tighe, Philadelphia, for appellant.

Edward A. Monsky, Scranton, for Davis, appellee.

Daniel E. Cummins, Scranton, for Prutzman and Metroka.

Before: JOHNSON, JOYCE, and OLSZEWSKI, JJ.

OLSZEWSKI, J.

¶ 1 Roger Steigerwalt ("appellant") appeals following the order issued by the court below granting a new trial on the issue of survival action damages. The order was entered on the post-trial motion of John and Kathleen Davis ("appellees") who appeared below asserting claims individually and as co-administrators of the Estate of Erin Davis, their deceased daughter. Denise Prutzman and Edward Metroka, individually and as co-administrators of the estate of Holly Metroka, join the arguments of appellant in part and the arguments of appellees in part. We affirm the decision of the trial court.

¶ 2 As the trial court explained:

This action is the result of a fatal motor vehicle accident that occurred on February 10, 1997. [Appellant] was the driver of a 1994 Chevrolet Suburban that collided with a 1993 Mercury Tracer driven by Holly A. Metroka. Erin Lynn Davis, was a passenger in the Metroka vehicle. She and Ms. Metroka both suffered fatal injuries from the collision. Her parents, [appellees,] asserted claims individually and as co-administrators of her estate, under the Wrongful Death Act, 42 Pa.C.S.A. § 8301, and the Survival Act, 42 Pa. C.S.A. § 8302, against [appellant] and Ms. Metroka's estate.

After a four-day trial, on October 11, 2001, a jury returned a verdict in favor of the [appellees], against both defendants. The jury apportioned causal negligence at ninety percent against Ms. Metroka and ten percent against [appellant]. It then awarded $10,000 in damages in the wrongful death action and $30,000 in the survival action.

Trial Court Opinion, 3/14/02, at 1–2.

¶ 3 Following trial, appellees filed a post-trial motion seeking a new trial on damages. Appellant "opposed that motion and asked that, should a new trial be granted on damages, it should also be granted on liability." Trial Court Opinion, 5/15/02, at 2. By order dated March 14, 2002, the trial court granted a new trial, but only with respect to damages in the survival action. This appeal followed.

¶ 4 On appeal, appellant argues that the trial court erred in three respects. Appellant first argues that the trial court erred in allowing John Shane, M.D. to testify about the speed of his car (the "Steigerwalt vehicle"). Appellant further argues that the trial court abused its discretion in setting aside the jury verdict. Finally, appellant argues that the trial court erred

by limiting the new trial to the issue of damages.

1.

¶ 5 We first address appellant's argument that the trial court erred in allowing appellees' expert, John Shane, M.D. to testify about the speed of the Steigerwalt vehicle. Dr. Shane testified as an impact pathologist, basing his opinion of the speed of the Steigerwalt vehicle on the injuries sustained by Erin Lynn Davis. On this point, appellant blends two issues into one: he seems to be challenging both Dr. Shane's qualifications to offer an expert opinion, and the validity of the basis of Dr. Shane's expert opinion.

a.

¶ 6 With regard to Dr. Shane's qualifications to offer an expert opinion about the speed of the Steigerwalt vehicle, Pa.R.E. 702 controls. Rule 702 provides:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

¶ 7 Naturally, neither of the parties to the appeal, nor the trial court, contest the fact that specialized knowledge beyond that possessed by a layperson would be helpful to determine the speed of the Steigerwalt vehicle. Testimony about the speed of the vehicle that is not based on actual observation of the accident necessarily relies on technical or other specialized reconstructive knowledge beyond that possessed by a layperson. *See, e.g., Haeberle v. Peterson*, 262 Pa.Super. 247, 396 A.2d 738 (1978).

¶ 8 Appellant argues, however, that Dr. Shane did not possess the necessary scien-

tific, technical or other specialized knowledge required to offer an expert opinion on the issue of the speed of the Steigerwalt vehicle. According to appellant, "it is . . . clear that [appellees'] medical expert, John J. Shane, M.D. did not, and does not, possess sufficient skill, knowledge, or experience . . . such that his opinion as to the speed of the vehicles at the time of the collision would properly aid the jury in resolving the dispute." Brief for appellant at 14.

¶ 9 The most substantial portion of appellant's attack on Dr. Shane's qualifications is that Dr. Shane's particular expertise did not qualify him to render an expert opinion on the speed of the Steigerwalt vehicle. According to appellant,

John Shane, M.D. was not offered, and did not testify, as an expert in a . . . field of medicine. Rather, he was offered as an expert in pathology, forensics and "impact pathology," and testified as an accident reconstructionist in rendering an opinion of the speed of the Steigerwalt vehicle. Impact pathology, according to [Dr. Shane's] testimony, is, among other things, the study of force necessary to cause certain injuries.

*Id.* at 20–21 (emphasis removed and citation to record omitted). Construing the breadth of impact pathology narrowly, and casting doubt on the usefulness of impact pathology in the present case, appellant suggests that

[w]hile he may have been qualified to offer an opinion regarding the force necessary to cause the plaintiff's injuries, John Shane, M.D. was not, and is not qualified to render an opinion on how the accident occurred, including the estimated speed of either of the two vehicles which produced that force.

*Id.*

¶ 10 Unsatisfied with his minimization of impact pathology, appellant goes further

by questioning Dr. Shane's claims of expertise in the field. "Impact pathology," appellant points out, "is not on Dr. Shane's Curriculum Vitae, and he has never published anything in the field of impact pathology." *Id.* at 21 n. 2 (citations omitted).

¶ 11 While appellant's arguments raise relevant considerations for a finder of fact seeking to assign weight to Dr. Shane's expert testimony, they do not persuade us that the trial court erred in permitting Dr. Shane to offer expert testimony on the speed of the Steigerwalt vehicle.

It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness had any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given such testimony is for the trier of fact to determine.

*Von Der Stuck v. Apco Concrete,* 779 A.2d 570, 573 (Pa.Super.2001), *appeal denied,* 568 Pa. 634, 793 A.2d 909 (2002) (citations omitted). Moreover, "[a]dmission of expert testimony is within the trial court's discretion and such ruling will not be disturbed unless there has been a clear abuse of that discretion." *Wack v. Farmland Industries,* 744 A.2d 265, 268 (Pa.Super.1999), *appeal denied,* 565 Pa. 649, 771 A.2d 1287 (2001).

¶ 12 We see no abuse of discretion in the trial court's finding that Dr. Shane was qualified to offer an expert opinion as to the speed of the Steigerwalt vehicle. As the trial court explained, Dr. Shane

testified that based upon his training and experience he can determine from the nature of Ms. Davis' skull fractures the kinetic energy that had to be pres-

ent in order to cause those fractures. Having made that determination, and given the mass of the Steigerwalt vehicle, he testified that it was a simple mathematical calculation of the speed that the vehicle had to be traveling in order to generate sufficient kinetic energy to cause the fractures that occurred in Ms. Davis' skull.

Trial Court Opinion, 5/15/02, at 2.

¶ 13 It is clear that Dr. Shane had more than a reasonable pretension to specialized knowledge on the subject of the speed of the Steigerwalt vehicle.

Dr. Shane explained the formula that he used in determining the speed of the vehicle and stated that the basis for the formula was learned through course work, his experience in autopsies and through working with police departments. [Dr.] Shane further discussed his knowledge of skull fractures and how the field of impact pathology provided analysis regarding the kinetic energy needed to cause a skull fracture. [Dr.] Shane testified that he attended seminars and courses in the field of impact pathology. He asserted that using his knowledge in this area he could determine the kinetic energy needed to produce a given injury. He claimed the Attorney General's Office and the Lehigh County District Attorney's Office had consulted with him in the past to determine speed calculations in this area and he also offered opinions regarding speed of vehicles in prior court cases.

Trial Court Opinion, 3/14/02, at 4 (citations to Notes of Testimony omitted).

b.

¶ 14 The second element of appellant's argument that the trial court erred in allowing Dr. Shane to testify about the speed of the Steigerwalt vehicle is an argument against the validity of the basis of Dr. Shane's expert opinion. According to appellant, "John Shane, M.D., bases his calculation of the speed of the Steigerwalt vehicle on the amount of kinetic energy necessary to cause the injuries sustained by the decedent, Erin Lynn Davis. This calculation, and method of calculation, is improper." Brief for appellant at 17 (citation omitted).

¶ 15 But appellant fails to establish here, as he did below, that Dr. Shane's methods and calculations are novel and improper. What is missing from appellant's argument is a proper explanation of *why* it is unacceptable for Dr. Shane to base his calculations on the injuries sustained by Ms. Davis.

¶ 16 In determinations of the validity of the methods underlying expert testimony, Pennsylvania courts use the test employed in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (D.C.Cir.1923). *Trach v. Fellin,* 817 A.2d 1102 (Pa.Super.2003). "[T]he *Frye* court recognized that the essence of admissibility is general acceptance," by the scientific community, of the principles and methodology employed by the expert. *Id.* at 1110. The *Frye* test is employed by courts to ensure that novel scientific evidence has obtained acceptance in the scientific community. *Id.* at 1109.

¶ 17 The simple fact that the methods of calculation of impact pathology differ from other types of accident reconstruction is not enough to render Dr. Shane's method and calculations improper as the basis of expert testimony. A determination of the speed of a vehicle based on the physical damage sustained by occupants of a vehicle with which it collided is not patently unscientific. Appellant has failed to establish on appeal that the impact pathology underlying Dr. Shane's calculations does

not have general acceptance in the scientific community.

¶ 18 Appellant's failure in this respect is analogous to his failure to properly challenge the basis of Dr. Shane's expert testimony at trial. As explained by the trial court:

> On May 9, 2001, the court issued a trial attachment order noting that all motions in limine must be presented "as soon as the issue is known to counsel and no later than the day of jury selection." On July 9, 2001, [appellant] filed motions in limine on eighteen issues. Three of the issues dealt with Dr. Shane. The fifth motion dealt with Dr. Shane's testimony on the issue of the victim's pain and suffering. The seventh motion dealt with the expected testimony of Dr. Shane as to the direction in which he believed the victim was looking at the time of the collision. The eighteenth issue sought to preclude Dr. Shane from offering his opinion as an accident reconstructionist. The motion specifically addressed Dr. Shane's qualifications to give an opinion, not the science he used to render an opinion. None of the issues questioned the scientific basis behind any of [Dr.] Shane's claims.
>
> * * *
>
> At trial, Dr. Shane presented his qualifications ... claiming experience in the field of impact pathology which rendered him capable of expressing an opinion as to the speed of the Steigerwalt vehicle at the time of impact. Attorney Namey [representing appellant] raised an objection and counsel came to sidebar. At sidebar Namey asked the court to limit [Dr.] Shane's testimony in the field to impact pathology because "I'm not sure that he's offered enough qualifications." Namey further claimed that [Dr.] Shane's opinions were very vague. The Court stated that it had a question as to [Dr.] Shane's ability to estimate speed and asked the basis of his training to do that. Attorney Namey then asked that further questioning of Shane be conducted outside the presence of the jury and the court agreed.
>
> At the in-camera hearing Dr. Shane explained the formula that he used in determining the speed of the vehicle and stated that the basis for the formula was learned through course work, his experience in autopsies and through working with police departments. [Dr.] Shane further discussed his knowledge of skull fractures and how the field of impact pathology provided analysis regarding the kinetic energy needed to cause a skull fracture. [Dr.] Shane testified that he attended seminars and courses in the field of impact pathology. He asserted that using his knowledge in this area he could determine the kinetic energy needed to produce a given injury. He claimed the Attorney General's Office and the Lehigh County District Attorney's Office had consulted with him in the past to determine speed calculations in this area and he also offered opinions regarding speed of vehicles in prior cases. After counsel had concluded their examination of Dr. Shane, Attorney Namey specifically stated "No further questions, Your Honor[.]" The court then asked [Dr.] Shane to show how he calculated the speed of the Steigerwalt vehicle. [Dr.] Shane did his calculation on an easel so counsel could see it. When [Dr.] Shane had concluded, Attorney Namey stated "if it would help the Court make a decision, I would offer Mr. Hudak." The court replied "No. I'm going to allow Dr. Shane to express his opinion. You can challenge it based on the—attack his credibility and the weight of his opinions."

Trial Court Opinion, 3/14/02, at 3–4 (citations to record omitted). The trial court did not abuse its discretion in admitting the expert testimony of Dr. Shane.

## 2.

¶ 19 The second main contention of appellant is that the trial court erred in setting aside the jury verdict. As previously explained, the parents of Erin Davis sought damages in the present action individually and as co-administrators of her estate, under the Wrongful Death Act, 42 Pa.C.S.A. § 8301, and the Survival Act, 42 Pa.C.S.A. § 8302. The jury awarded $10,000 in damages in the wrongful death action and $30,000 in the survival action. Finding the jury's award of $30,000 in the survival action "shocking," Trial Court Opinion, 3/14/02 at 10, the trial court granted a new trial only with respect to damages under the survival action.

¶ 20 Appellant argues that the trial court abused its discretion by awarding the new trial with respect to survival damages. Appellant argues that, because the damages awarded with respect to the survival action were based largely on speculation about Erin Davis's future earnings and occupation, they should have been left to the jury to decide. According to appellant, appellees "wholly fail[ed] to demonstrate the existence of 'passion, prejudice, partiality, or corruption' by the jury to satisfy setting aside the verdict." Brief for appellant at 40.

¶ 21 We agree with appellant that "the amount of a damage award is an issue for the jury which should rarely be altered on appeal." *Peck v. Haberle*, 434 Pa.Super. 132, 642 A.2d 509, 511 (1994), and that, in assessing damages, "the jury is free to believe all, some, or none of the testimony presented by a witness." *Neison v. Hines*, 539 Pa. 516, 653 A.2d 634, 637 (1995). We do not agree, however,

that the trial court erred in granting a new trial with respect to damages in the survival action.

¶ 22 As pointed out by the trial court.

[t]he measure of damages awarded in a survival action include[s] the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of [her] earning power—less personal maintenance expenses, from the time of death through [her] estimated life span.

*Estate of Coleman*, 772 A.2d 1026, 1027 (Pa.Super.2001).

¶ 23 In finding the jury's award of $30,000 in the survival action shocking, the trial court concluded that the "verdict simply is not reasonable and bears no rational relationship to the evidence presented at trial." Trial Court Opinion, 3/14/02, at 11; *see Kiser v. Schulte*, 538 Pa. 219, 648 A.2d 1, 4 (1994) ("A jury verdict is set aside as inadequate when it appears to have been the product of passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff."). We agree with the trial court.

¶ 24 At trial, appellees presented the testimony of William Walker, a vocational rehabilitation counselor, who testified about Erin Davis's vocational path. Davis

graduated from high school in 1996 and attended Penn State University in the nursing Bachelor of Science program. She also completed a nurse's aide program and received her certification. She began working part-time as a nurse's aide and earned $3,686 in 1996. She completed her first year at Penn State and then successfully applied to the Pottsville Hospital School of Nursing for its two-year RN [, i.e., registered

nurse,] program. She was scheduled to begin that program in September of 1997.

Trial Court Opinion, 3/14/02, at 9–10. Walker testified that examples of 1997 starting salaries for registered nurses, who are currently in high demand, ranged from $30,139, in Pottsville, to $41,530 in Allentown. *Id.* at 10.

¶ 25 Dr. Frank Corcione, a professor of economics and finance, also testified. Assuming an annual salary of $35,526, Dr. Corcione determined that Davis had

> a lifetime earnings capacity minus personal expenses of $872,254 if she had worked 33.3 years. He determined a lifetime earning capacity minus personal expenses of $1,152,528 if she had worked 43 years. He also provided higher figures for starting salaries of $41,018 (the state average salary for RN's) and $38,857 (based on a sliding salary scale).

*Id.* (citations to Notes of Testimony omitted).

¶ 26 Apparently, the juxtaposition of evidence conservatively estimating Davis's loss of lifetime earning capacity at $872,254, with the jury award of $30,000, shocked the trial court. As a result, the court awarded a new trial with respect to survival action damages.

¶ 27 In support of its award of a new trial for damages with respect to the survival action, the trial court discussed the analogous case *Kiser v. Schulte*, 648 A.2d at 1. In *Kiser*, the estate of Kerry Kiser, and Kiser's parents, brought suit when Kiser was killed following a wedding reception organized by Linda Fox Trinnes and Edward Trinnes. Kiser died in an automobile accident when the driver of a car in which she was traveling, Daryl Schulte, crashed. The accident was attributable to the large quantity of alcohol that Schulte, Kiser and other traveling companions consumed, despite being underage, at the wedding reception.

¶ 28 Survival and wrongful death actions resulted from Kiser's death. At trial, liability was heavily contested, but the only evidence on the issue of damages was offered by plaintiffs. Plaintiffs' damages expert testified that the loss of services to Kiser's parents would range from $11,862.50 to $18,980.00. He further testified, based on conservative figures proffered on cross-examination, that the net economic loss resulting from the death of Kiser equaled at least $232,400.20.

¶ 29 The jury found Schulte, the wedding reception hosts, and Kiser herself, negligent. The jury further found, however, that Kiser's negligence was not a substantial factor in bringing about her death. The jury awarded damages in the amount of $25,000.

¶ 30 This Court, considering the matter on appeal, entered an order that vacated this award, finding it inadequate, and remanded for a new trial on the issue of damages alone. Affirming this Court on further appeal, our Supreme Court noted that a jury award of damages can be set aside only

> when it appears to have been the product of passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff. Where the jury's verdict is so contrary to the evidence as to "shock one's sense of justice" a new trial should be awarded.

*Kiser*, 648 A.2d at 4 (citations omitted). The Court observed, however, that the jury verdict of $25,000 did not bear any rational relationship to plaintiffs' uncontroverted expert testimony which established that the net economic loss resulting from Kiser's death equaled at least $232,400.20.

¶ 31 In reaching this conclusion, our Supreme Court emphasized the fact that the only evidence of damages was that offered by plaintiffs; in *Kiser*, the defense did not present any evidence or experts on the question of damages. Nor, our Supreme Court observed, could the *Kiser* jury discount the evidence of damages offered by plaintiffs as, even under cross examination, plaintiffs' damages expert only conceded a more conservative estimation of damages that still exceeded the jury award.

¶ 32 Similarly, in the present case, the trial court did not abuse its discretion by awarding a new trial with respect to survival damages. The jury's award of $30,000 bears no reasonable relationship to evidence conservatively estimating Davis's loss of lifetime earning capacity at $872,254. Here, "[n]either defendant presented an expert [in] the area of economic damages." Trial Court Opinion, 3/14/02, at 10; *see also* Brief for appellant at 41. Cross-examination of appellees' expert elicited no change in his estimates. "Counsel only questioned him on how he derived the maintenance costs and had [him] admit that he could not be sure if the decedent would have been a nurse had she lived." Trial Court Opinion, 3/14/02 at 10. In the present case, like *Kiser*, a new trial with respect to damages was warranted.

### 3.

¶ 33 Appellant's final contention is that the trial court erred in limiting the new trial to the issue of damages. As appellant points out,

> The granting of a new trial limited to damages was not permitted under the common law. However, Pennsylvania and most other jurisdictions have adopted a rule permitting such limited new trials under certain specific circumstances. A new trial limited to the issue of damages will be granted where: (1) the issue of damages is not "inter-twined" with the issue of liability; and (2) where the issue of liability has been "fairly determined" or is "free from doubt."

*Kiser,* 648 A.2d at 1 (citations omitted); *see also Monschein v. Phifer,* 771 A.2d 18 (Pa.Super.2001).

¶ 34 Appellant's argument is that the trial court erred in granting a new trial limited to the issue of damages because liability was vigorously contested below. According to appellant, "[i]f the parties vigorously dispute the liability issues in the case, then [the liability issues] are not 'free from doubt' nor can they be 'fairly determined' for the purposes of limiting a new trial solely to the issues of damages in cases involving alleged inadequate verdicts." Brief for appellant at 29. In support of this assertion, appellant cites cases including *Dougherty v. Sadsbury Township,* 299 Pa.Super. 357, 445 A.2d 793 (1982), and *Gagliano v. Ditzler,* 437 Pa. 230, 263 A.2d 319 (1970). These cases, however, do not support the assertion that a vigorous dispute about liability, in and of itself, means that a new trial cannot be limited to damages. Rather, what these cases recognize is that a vigorous dispute about liability, far from being dispositive, often simply indicates that liability is not free from doubt, or has been intertwined with the issue of damages.

¶ 35 In *Dougherty,* this Court modified the grant of a new trial, which had been granted by a trial court only as to damages, to provide for an unlimited general new trial. The case involved a suit to recover damages for the death of a motorcycle passenger who had been killed at a busy intersection in which a police officer had been directing traffic. The question of negligence of the drivers of the vehicles involved and of the traffic officer was heavily contested at trial. The jury found

only the traffic officer and his employer, Sadsbury Township, liable. Despite evidence that the motorcycle passenger's future wages would have totaled in excess of $170,000, the jury awarded damages of only $5,000. This Court agreed that the inadequate damages warranted a new trial. But, because "the question of damages was heavily intertwined with the issue of the negligence of the several defendants," *Dougherty*, 445 A.2d at 795, this Court found that the trial court abused its discretion by limiting the new trial to damages.

¶ 36 In *Gagliano*, an automobile owned and operated by Dr. Anthony Gagliano collided at night with a tractor pulling a hay wagon. Gagliano and his passengers sued the owner and operator of the tractor. A verdict was returned in favor of Gagliano in the amount of $650. Gagliano filed a motion for a new trial limited to the issue of damages, which was granted. On appeal, this Court modified the lower court's order so that the new trial would be granted generally, rather than limited to damages. Our Supreme Court affirmed the order of this Court. The Supreme Court noted that the issue of negligence was heavily disputed below: though the hay wagon lacked "electric clearance lamps" that were required by the vehicle code, the hay wagon driver maintained that he had pulled his wagon approximately three feet off the side of the road when he saw Gagliano approaching. According to the Supreme Court,

> where a substantial conflict exists on the question of liability, such that a low verdict might indicate that the jury compromised the liability issue with the amount of damages awarded, it is an abuse of discretion for the lower court to grant a new trial limited to the issue of damages.

*Gagliano*, 263 A.2d at 320.

¶ 37 In the present case, the trial court did not abuse its discretion by limiting the new trial to damages in the survival action. The issue of damages in the survival action is not "intertwined" with the issue of liability. Rather, liability has been fairly determined. "The jury apportioned causal negligence at ninety percent against Ms. Metroka and ten percent against [appellant]." Trial Court Opinion, 3/14/02, at 1–2. Moreover, as the trial court observed, the decedent, Erin Davis, was a passenger in the Metroka vehicle. The jury was instructed that under no circumstances were they to consider attributing negligence to her. *Id.* at 11. Accordingly, there is no danger that the jury verdict compromised defendant liability with the amount of damages awarded. *Kiser*, 648 A.2d at 8 ("A compromise verdict is one where the jury, in doubt as to the defendant's negligence or plaintiff's contributory negligence, returns a verdict for the plaintiff but in a lesser amount than it would have if these questions had been free from doubt.").

¶ 38 Order affirmed.