J-A19007-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| NATIESHA BELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JACQUELINE O'NEILL | : | |
| | : | |
| Appellant | : | No. 2393 EDA 2022 |

Appeal from the Judgment Entered August 19, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 1910003845

BEFORE: BOWES, J., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:             **FILED NOVEMBER 16, 2023**

Jacqueline O'Neill ("Defendant") appeals from the judgment entered in favor of Natiesha Bell ("Plaintiff") upon the jury's verdict in this automobile collision case. We vacate the judgment, reverse in part the order denying Defendant's post-trial motions, and remand for a new trial on causation and damages.

The salient background is as follows. On February 11, 2019, Defendant rear-ended Plaintiff in a low-speed collision in Philadelphia. Plaintiff filed a complaint on October 31, 2019, alleging that, as a result of the collision, she suffered permanent injuries. *See* Complaint, 10/31/19, at ¶ 6. The case proceeded to trial on both liability and causation.

---

[*] Retired Senior Judge assigned to the Superior Court.

Plaintiff took the videotaped deposition of her treating physician, Scott M. Fried, D.O., for use at trial. Dr. Fried explained that Plaintiff suffered from brachial plexopathy.[1] One form of this condition is the stretching, tearing, or inflammation of the tissues surrounding the nerves that run from the neck into the fingers. Unfortunately, this can produce scar tissue. *See* Videotaped Deposition of Scott M. Fried, D.O., 3/17/22, at 25-28. The scar tissue, in turn, can prevent the nerves and muscles from sliding separately from each other, resulting in permanent nerve pain triggered by regular activities such as turning the head or holding a cell phone. *Id*. at 32-35.

Regarding causation of Plaintiff's injuries, Dr. Fried testified as follows:

Q. With that understanding of medicine, could you explain to us what happened to [Plaintiff] on February 11, 2019 to cause this brachial plexopathy?

A. Surely. [Plaintiff is] driving her car. She is looking to the left, and she is suddenly hit from behind. Her hands are on the wheel, and her head goes not just flexion/extension, but also side to side, and this is important. The head and neck are pretty good at doing this (indicating), but doing this (indicating) is much more difficult for the neck. So when you have a neck that is rotated, and it is flexion/extensioned in this manner, it pulls much more aggressively on the side of the neck and impacts all of this. So, as she is hit and thrust like this, there is a stretch, and that is the initial tearing of that fascia.

Q. And that is what I wanted you to focus on. You say a tearing -- when you say "fascia," is that synonymous with tearing the scalene muscle and the fascia within it?

_____

[1] Brachial plexopathy involves an injury to "the nerves that are the main circuit board[,] that form the major nerves that go down into the arm[.]" Videotaped Deposition of Scott M. Fried, D.O., 3/17/22, at 24-25.

A.   Fair enough.

Q.   What is a strain and sprain?

A.   A strain and sprain is a stretching and tearing of soft tissue structures.

Q.   Does one have to be hit hard to have a strain and --

A.   Strain and sprain?

Q.   Yes.

A.   Not -- it is not the velocity of the impact, as much as it is what the body does in reaction to it.  I mean, some people can have -- basically, if somebody comes up and pretends they're throwing a punch at you and you go like this (indicating), you can pull, and you can actually partially tear muscle.  You don't necessarily have to be thrown on the ground to tear muscle and to tear fascia.  And this is the key to it, it's the loading.  Where are you?  She is here, she is looking this way (indicating).  This is already on stretch.  Everything is tight, it is on stretch.  It doesn't take that much more to push that over and begin to tear those tissues.  So it is not the velocity of the impact, as much as what the body is doing and where it is when it is impacted, and this is the nature of this.

Q.   And I think that is important for the jury to know.  When you have this type of strain and sprain . . . and you have the stretching and tearing of the soft tissues, you are not saying that the nerves were initially injured or damaged during the impact, correct?

A.   No.  Basically, they were stretched somewhat, but the nerves themselves internally weren't damaged.  It's the fascia around these nerves that became torn.

Q.   And once someone starts to develop the scar tissue, as you said, as part of the healing process, the normal healing process, what, if anything, does that scar tissue do to compress the nerve to cause a brachial plexopathy and the symptoms associated with it?

A.      Again, according to the inflammation, according to how that fascia begins to scar back down and heal back down, there is many degrees of what happens.  But once that fascia is torn, and once it becomes inflamed, it then begins to form around these nerves. And then, unfortunately, in the early healing phases, just daily activities of living, brushing your teeth, reaching, turning your head, can retear that fascia, and then it becomes a progressive aggravating factor around it.

So in different people, fascia heals in slightly different ways, and according to their body habitus, the nature of what they are doing, and also according to how inflamed that fascia became. Some people are more reactive than others, and then of course we can see that over the course of the development of the injury, but -- and it certainly shows on the ultrasound evaluations, but then we can see some people have fascia that just forms thicker, just like some people are [k]eloid scar formers.  You don't know who is going to have a more rigid result and fascial scarring.

Q.      And Doctor, when someone has the scar tissue that compresses the nerve, is that a painful injury?

A.      It is.

Q.      Is it a progressive injury?

A.      Yes, unfortunately.

Q.      And is it a permanent injury?

A.      Yes, once the scar is formed, this is permanent, and we can't reverse that.

*Id*. at 35-40.

During pretrial proceedings, Plaintiff pursued motions *in limine* as to,

*inter alia*, defense experts David L. Glaser, M.D., and McGowan Associates,

biomechanical engineers.[2]  First, Dr. Glaser in his report asserted that:  (1) it is not unusual for people to develop soreness after "a minor motor vehicle crash" due to sustaining "a minor strain;" (2) if Plaintiff had such a strain, it had completely resolved; (3) MRI images showed "only minor age-related degenerative disease without evidence of aggravation;" (4) "more force" would have been required to injure Plaintiff's musculoskeletal system; (5) Plaintiff's treatment to date was "excessive for this mechanism of injury;" and (6) she required no further treatment.  **See** Expert Report of David L. Glaser, M.D., 10/5/20, at 4 (included in the certified record as Exhibit A to Plaintiff's memorandum of law in support of her motion *in limine* concerning Dr. Glaser).

Pertinent to this appeal, Plaintiff sought to preclude Dr. Glaser from opining that, based upon the amount of damage to the vehicles shown in photographs, more force would have been required for Plaintiff to sustain her injuries.  Defendant observed that Plaintiff's expert, Dr. Fried, offered the same type of testimony in his videotaped deposition for trial, indicating that the photographs showed nothing inconsistent with his opinion that Plaintiff suffered serious, permanent injuries as a result of the collision.  **See** N.T. Motions, 4/21/22, at 12.  The trial court agreed that Plaintiff was seeking to

---

[2] The report supplied pre-trial was authored by Peter Chhour, Ph.D., of McGowan Associates.  However, Defendant indicated in her response to Plaintiff's motion *in limine* that Dr. Chhour no longer was employed by McGowan Associates or offering trial testimony.  Instead, Joseph McGowan, Ph.D., would adopt the report and testify based upon it.

exclude testimony from Defendant's medical expert equivalent to what she had elicited from Dr. Fried, and indicated that, if Plaintiff were willing to forgo offering that opinion from her expert, the court would preclude Defendant from doing so. *Id*. at 15. Plaintiff indicated an unwillingness to withdraw Dr. Fried's testimony on that point. Nonetheless, oral argument continued, with the trial court ultimately making the following ruling:

> And with regard to the testimony that more force would be required to sustain the injuries that the plaintiff is claiming she sustained in this accident, I have to hear his expertise. That certainly would be a biomechanical type of determination as opposed to a medical determination.
>
> Again, we have something in Pennsylvania called the eggshell skull plaintiff, whereas what would be an attack to a skull for someone in a normal state of health, if it happened to someone with an eggshell skull, it could result in a fractured skull and a very serious injury.
>
> So that principle, obviously, is not recognized in the testimony of this doctor so that portion of that testimony is stricken.

N.T. Motions, 4/21/22, at 19-20.

As for Defendant's biomechanical engineers, McGowan Associates had supplied a report addressing "the kinematics associated with [Plaintiff] during the subject incident" and "any potential biomechanical mechanisms associated with injuries or pathologies described in her medical records." *See* McGowan Associates Report, 3/25/21, at 1 (included in the certified record as Exhibit A to Plaintiff's memorandum of law in support of her motion *in limine* concerning Dr. Chhour). Ultimately, the report concluded that the force, direction, and magnitude of the collision were no more likely to cause injury to lumbar and

cervical spine than vigorous activities of daily living, and, as for the neck, "were associated with non-injurious values, including cervical nerve root impingement injuries radiating to the brachial plexus." *Id*. at 13.

With regard to Plaintiff's claim that only a medical doctor was qualified to offer an opinion as to what caused or did not cause Plaintiff's injuries, the trial court agreed, issuing the following decision:

> I'm not going to permit a nonmedical expert to give medical testimony. But [a] biomechanical expert could talk about load values, could talk about crash values, could talk about what happened to a body in a crash at five or ten miles an hour, 15 miles an hour or above. But he cannot testify that an occupant in a motor vehicle in this case cannot have sustained the injuries that she is complaining of in the motor vehicle accident. That is a medical determination, which a biomechanical expert cannot make. He can talk all he wants about load values and things like that. That is assuming that he is qualified to testify as a biomechanical expert, and that's within their bailiwick. But he cannot make a medical determination. And that's my ruling.

N.T. Motions, 4/21/22, at 32.

Trial was held from April 25 to 27, 2022. The jury heard from the parties, Plaintiff's ex-husband, the above-reproduced testimony of Dr. Fried, and Dr. Glaser, as constrained by the court's pre-trial ruling. Defendant also offered the videotaped testimony of Robert Lynch, P.E., an expert on collision reconstruction. Mr. Lynch testified that the force of the collision was not significant enough to register as an event in the black-box Event Data Recorder in Defendant's vehicle, and that the change in velocity Plaintiff experienced as a result of the collision was less than six miles per hour. *See* Videotaped Deposition of Robert Lynch, P.E., 4/21/22, at 28, 32.

After closing arguments, and over Defendant's objection,[3] the trial court charged the jury with the eggshell skull plaintiff instruction, as emphasized below:

> In order for the plaintiff to recover in this case, the defendant's negligent conduct must have been a factual cause in bringing about harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct.
>
> To be a factual cause the conduct must have been an actual real factor in causing the harm even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.
>
> To be a factual cause the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as you find the defendant's own negligence is a factual cause of the injury.
>
> **It is the law in the Commonwealth of Pennsylvania that a wrongdoer takes his victim as the wrongdoer finds her. A wrongdoer is liable for all harm caused by his negligent act though increased by an unknown physical condition that could not have been discovered or anticipated prior to the wrongdoing**.

N.T. Trial, 4/27/22, at 277-78 (emphasis added).

The jury returned a verdict in favor of Plaintiff, awarding $700,000 in economic damages and $300,000 in non-economic damages. Defendant filed timely post-trial motions seeking judgment notwithstanding the verdict ("JNOV") or a new trial. The trial court denied relief, but granted a motion for

---

[3] **See** N.T. Trial, 4/27/22, at 183-84, 188.

delay damages filed by Plaintiff. Thereafter, judgment was entered on the verdict in the amount of $1,052,513.89. Defendant filed a timely notice of appeal. The trial court ordered Defendant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Defendant filed a timely but far-from-concise twenty-three-page statement expounding upon four claims of error. With the benefit of a trial court opinion and oral argument from the parties, we entertain Defendant's issues, stated as follows:

> 1. Did the trial court abuse its discretion or commit an error of law by (a) charging the jury with an eggshell-plaintiff instruction; (b) prohibiting Defendant's medical expert from presenting certain testimony at trial; (c) placing improper restrictions on Defendant's biomechanical experts; and (d) refusing to take corrective action after it became aware the jury "rounded up" the damages award by at least $42,500.00?
>
> 2. Did the trial court abuse its discretion or commit an error of law by not ordering a new trial on all issues or, alternatively, on the issues of causation and damages?
>
> 3. Did the trial court abuse its discretion or commit an error of law by not reducing or remitting the $1 million verdict?

Appellant's brief at 3.

Initially, we observe that "[w]hen reviewing an order denying a new trial, our standard of review is to decide whether the trial court committed an error of law that controlled the outcome of the case or committed an abuse of discretion." **Pittsburgh Const. Co. v. Griffith**, 834 A.2d 572, 585 (Pa.Super. 2003) (cleaned up).

As we find it dispositive, we begin with Defendant's claim that the trial court erred in precluding Dr. Glaser from testifying that the collision produced

- 9 -

insufficient force to cause the injuries that Plaintiff alleged. Our standard of review of the trial court's ruling is as follows:

> The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Farese v. Robinson*, 222 A.3d 1173, 1185 (Pa.Super. 2019) (cleaned up).

> We have further observed:

> It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness had any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given such testimony is for the trier of fact to determine.

*Davis v. Steigerwalt*, 822 A.2d 22, 25 (Pa.Super. 2003) (cleaned up).

Here, as recounted above, the trial court initially indicated that it would need to hear more about Dr. Glaser's qualifications to decide whether he would be permitted to testify, consistent with his report, that more force would have been required to produce a musculoskeletal injury in Plaintiff. However, rather than deferring a ruling on Plaintiff's motion *in limine* until trial, the court immediately proceeded to rule that Dr. Glaser could not offer any such testimony based upon the perceived inconsistency of this opinion with Pennsylvania law concerning an eggshell skull plaintiff.

Defendant argues that the trial court's ruling conflated the concepts of factual causation on the one hand and proximate causation of damages on the

other. **See** Defendant's brief at 37. She maintains that Dr. Glaser's proposed testimony spoke to a lack of factual causation, not that the injuries were too unexpected to justify imposition of liability, and thus "did not run afoul of the eggshell-plaintiff rule." **Id**. at 40 (cleaned up). Moreover, Defendant asserts that Plaintiff opened the door to the proposed testimony, which the trial court initially contemplated when considering the *in limine* arguments, by introducing the portion of Dr. Fried's testimony where he opined that the speed of the impact was sufficient to cause Plaintiff's injury. **Id**. at 41. Defendant contends that the trial court improperly and unfairly prevented her from responding to and rebutting Dr. Fried's testimony. **Id**. at 41-42.

We agree with Defendant that the trial court erred in precluding Dr. Glaser from opining that the collision was not of sufficient magnitude to cause the serious injuries described by Dr. Fried. Critically, the eggshell-skull plaintiff instruction does not speak to causation, but to the extent of damages for which the defendant is liable. **See**, **e.g.**, **Meyer v. Union R. Co.**, 865 A.2d 857, 863 (Pa.Super. 2004) (indicating that the eggshell skull principle dictates that "the tortfeasor is liable for the full extent of the injury that his conduct has caused" and that total damages may be reduced if the jury credits evidence that the plaintiff would have ultimately sustained the same injury eventually as a result of a particular susceptibility).

Dr. Glaser's opinion that this collision was medically incapable of producing the results that Plaintiff alleged is not a violation of Pennsylvania

law concerning damages, but rather proper causation testimony from a board-certified orthopedic surgeon who specialized in musculoskeletal medicine, namely nerves, ligaments, tendons, and joints, with a focus on the upper extremities. *See* N.T. Trial, 4/27/22, at 26-27. ***Accord Davis***, *supra* at 25-26 (holding trial court properly permitted a medical doctor to testify as to the kinetic energy necessary to cause the plaintiff's injury based upon training and experience with skull fractures). Just as Dr. Fried was permitted to opine that the collision caused Plaintiff's brachial plexopathy despite the minor damage to the vehicles, Dr. Glaser should have been permitted to rebut that the small force involved in the collision was insufficient to have caused in fact the extensive injuries Plaintiff claimed to have suffered.

We reject Plaintiff's argument that she did not open the door to the testimony in question because "Dr. Fried never testified on force." Plaintiff's brief at 38-39. As recounted above, Dr. Fried's testimony was that "it is not the velocity of the impact, as much as it is what the body does in reaction to it" that was determinative of the issue of causation. Videotaped Deposition of Scott M. Fried, D.O., 3/17/22, at 36-37. He informed the jury that one did not "necessarily have to be thrown on the ground to tear muscle and to tear fascia," but rather the position and motion of the body at the time of the collision could cause the tearing irrespective of "the velocity of the impact." *Id*. at 37.

Although Dr. Fried spoke of impact velocity while Dr. Glaser used the term "force," both plainly addressed the same issue, namely whether one sedan travelling at a speed of less than five miles per hour colliding with a comparably-sized stationary vehicle was a factual cause of permanent brachial plexopathy in Plaintiff. Dr. Fried was of the opinion that it was, while Dr. Glaser deemed it insufficient to cause the claimed injury. The different terminology did not warrant disparate rulings as to admissibility. The court should have permitted the jury to hear both opinions and weigh them as they saw fit.

Plaintiff alternatively argues that any error was harmless since Defendant was not prejudiced by the trial court's ruling. **See** Plaintiff's brief at 39-40. In this vein, Plaintiff asserts that "[t]he defense was able to put on all the evidence it wanted to try and prove Dr. Fried's testimony and expert opinions wrong . . . [b]ut the jury — the ultimate factfinder — did not find it credible." **Id**. at 38.

We cannot agree. The defense obviously was not permitted "to put on all the evidence it wanted." As Defendant also challenges on appeal, in addition to precluding Dr. Glaser from opining that the collision was not forceful enough to cause serious injury to Plaintiff, the trial court ruled that Defendant's biomechanical engineer could not testify about how much force was actually involved. The court properly noted that only a medical expert may testify about medical causation. **See** N.T. Motions, 4/21/22, at 32.

However, it then ruled that the proposed testimony from McGowan Associates was inadmissible because the biomechanical expert sought to "testify that an occupant in a motor vehicle in this case cannot have sustained the injuries that she is complaining of in the motor vehicle accident." *Id*.

Biomechanical engineers determine how injuries occur by applying the principles of physics. *See Webb v. Volvo Cars of N. Am., LLC*, 148 A.3d 473, 485 (Pa.Super. 2016). Here, a representative of McGowan Associates, based upon a biomechanical analysis that incorporated, *inter alia*, the force calculations indicated in Mr. Lynch's report, proposed to offer the following opinions:

1. Neck mo[ve]ments associated with the subject incident for **an individual anthropometrically similar to** [**Plaintiff**] were comparable to those associated in the scientific literature with vigorous activities of daily living and chiropractic manipulation and by comparison were no more likely to cause injury or to exacerbate existing cervical pathology.

2. Based on testing results and the severity of the subject incident, neck motion and loading in the subject incident were **associated with non-injurious values**, including cervical nerve root impingement injuries radiating to the brachial plexus.

3. Considering the subject occupant kinematics as well as the crash test results and their application to the subject scenario and occupant, force direction and magnitude of calculated loading were **below levels associated with lumbar spinal injury in the biomechanical literature**. Such loading, given the subject incident geometry, was inconsistent with an expectation of lumbar spine compressive injury **for an individual anthropometrically similar to** [**Plaintiff**]. Further, the forces and motions bounding the incident were no more likely to be associated

- 14 -

with exacerbation of existing lumbar spine pathology **in a person anthropometrically similar to** [**Plaintiff**] than would have been activities of routine daily and occupational living.

4. Head accelerations associated with the subject incident are indistinguishable from zero percent risk of concussion based on published risk curves.

*See* McGowan Associates Report, 3/25/21, at 13-14 (emphases added).

Hence, the proposed testimony was not impermissible causation testimony from a non-medical expert, but information about the forces involved in the collision and the results they typically produce in people anthropometrically similar to Plaintiff. This was permissible biomechanical expert testimony.[4] *See Webb*, *supra* at 485 (explaining that a biomechanical engineer did not offer improper medical testimony in opining that the forces involved in a collision were such that additional padding in a car seat would not have prevented the plaintiff's death).

Defendant wished the jury to hear both that (1) McGowan Associates was of the opinion that the type of collision involved in this case does not typically cause injury in people like Plaintiff, and (2) that Dr. Glaser opined

---

[4] Plaintiff and the trial court contend that, since Defendant did not call anyone from McGowan Associates to testify at trial, she failed to preserve this issue for appeal. *See* Plaintiff's brief at 40; Trial Court Opinion, 11/17/22, at 18. However, as Defendant aptly counters, it would have been futile to call a witness whose desired testimony was precluded. *See* Defendant's reply brief at 18 (citing, *inter alia*, Pa.R.E. 103(b) ("Once the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). Thus, the issue is properly before us.

that this low-impact collision did not in fact cause such an injury to Plaintiff. Neither expert sought to improperly tread outside their area of expertise, but rather to offer evidence tending to show that it was **not** more likely than not that Plaintiff sustained her claimed injuries as a result of Defendant's negligence. Yet the trial court allowed neither expert to testify as proffered.

Under these circumstances, we are not convinced that the trial court's rulings had no impact upon the verdict and were therefore harmless. ***See***, ***e.g.***, ***Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.***, 297 A.3d 404, 416 (Pa.Super. 2023) (holding that erroneous ruling on the admissibility of expert testimony prejudiced defendant and was therefore not harmless). However, the errors related only to the questions of causation and damages and not to Defendant's negligence. Accordingly, we reverse the trial court's order denying Defendant's post-trial motions insofar as the court declined to award a new trial on causation and damages.[5] Consequently, Defendant's remaining issues concerning the jury's damages award are moot.[6]

_____

[5] None of Defendant's claims of error advocated on appeal challenge the propriety of the jury's determination that Defendant breached a duty of care owed to Plaintiff. Hence, Defendant's negligence need not be relitigated, only the elements of whether the negligence caused damages to Plaintiff and the amount of those damages. ***See***, ***e.g.***, ***McNeil v. Owens-Corning Fiberglas Corp.***, 680 A.2d 1145, 1148 (Pa. 1996) ("[W]here the only trial errors disclosed in the record deal with specific and discrete issues, the grant of a new trial should be limited to those issues.").

[6] Our award of a new trial based upon this evidentiary issue moots Defendant's challenge to the amount of damages awarded. However, as it is likely to be
*(Footnote Continued Next Page)*

Judgment vacated. Order denying post-trial motions reversed in part.

Case remanded for a new trial on causation and damages. Jurisdiction

relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/16/2023

---

a point of contention upon retrial, we hold that the trial court's decision to offer an eggshell skull plaintiff damages instruction based upon Dr. Fried's testimony was not an abuse of discretion. As our recitation of the case above illustrates, Defendant's theory was that this low-impact collision either caused no injury to Plaintiff or caused a mild strain or sprain that had completely resolved. Plaintiff sought to prove the contrary by eliciting testimony that, while that may be true of some people, that was not true in this case, because Plaintiff in fact did develop scarring as a result of this collision, causing a substantial and permanent injury. Accordingly, the trial court was within its discretion in instructing the jury that, if it found that Defendant's negligent act was a factual cause of an injury, Defendant was nonetheless responsible for the unexpectedly severe result Plaintiff realized. *Accord Fretts v. Pavetti*, 422 A.2d 881, 885 (Pa.Super. 1980) (holding question of future damages was properly put to the jury based upon the fact that the plaintiff "was particularly susceptible to serious injury" based upon having varicose veins, because "[t]he tortfeasor must take his victim as he finds him" and is subject "to the same degree of liability [for the more extensive damages] as the infliction of an original wound").

- 17 -